**FOR PUBLICATION**

ATTORNEYS FOR APPELLANT:

**JAMES H. YOUNG**
Young & Young
Indianapolis, Indiana

**EDWARD R. HANNON**
Hannon Kolas & Centers, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**BRIAN J. PAUL**
**KELLY J. PITCHER**
**JASON MCNIEL**
Ice Miller LLP
Indianapolis, Indiana

FILED
Oct 03 2012, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DEBORAH A. CLEVELAND, as Personal Representative of the Estate of Robin W. Cleveland, | ) ) ) ) | |
| Appellant-Plaintiff, | ) ) | |
| vs. | ) ) | No. 49A02-1110-CT-948 |
| CLARIAN HEALTH PARTNERS, INC., | ) ) | |
| Appellee-Defendant. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Thomas J. Carroll, Judge
Cause No. 49D06-0807-CT-31194

**October 3, 2012**

**OPINION – FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Deborah Cleveland, as Personal Representative of the Estate of Robin W. Cleveland, appeals the trial court's denial of her motion to correct error and for relief from judgment in her action against Clarian Health Partners, Inc. ("Clarian"). Cleveland raises four issues for our review, which we restate as the following three issues:

1.  Whether she may raise her claim of surprise in the purported change in a nonparty fact witness's testimony at trial for the first time on appeal;

2.  Whether Indiana Trial Rule 26(E)(2) imposes a duty on a party to amend a nonparty witness's deposition testimony when that party learns of a change in the testimony before trial; and

3.  Whether Clarian's counsel committed misconduct under Trial Rule 60(B)(3) when counsel did not supplement the deposition testimony of Clarian's nonparty employee prior to trial.

We hold that Cleveland may raise a claim of surprise on appeal for the first time. But, on these facts, we need not address Cleveland's second issue. Rather, assuming for the sake of argument that Rule 26(E)(2) imposes a duty on a party to amend the prior deposition testimony of a party's nonparty employee, on this record we cannot say that Clarian committed misconduct under Trial Rule 60(B)(3) when it did not supplement that prior deposition testimony. Thus, we affirm the trial court's denial of Cleveland's motion to correct error and for relief from judgment.

**FACTS AND PROCEDURAL HISTORY[1]**

On July 3, 2002, Robin W. Cleveland ("Robin" or "Rob") fell approximately thirty feet from scaffolding while working at a construction site. Paramedics designated

---

[1] We held oral argument on August 8, 2012.

Robin as a level one trauma patient and transported him to Methodist Hospital, a level one trauma center. A level one trauma center is required to have an operating room readily available at all times for trauma patients. Robin arrived at Methodist Hospital at 9:53 a.m.

The trauma team at Methodist that day consisted of Dr. George Rodman, head of trauma; Dr. Scott Otto, chief resident; Dr. Jennifer Choi, a second-year resident; and several nurses and other staff members. The trauma team intubated Robin shortly after his arrival at the hospital and also gave him blood and crystalloid, a saline-electrolyte solution. To further assess the extent of Robin's injuries, the trauma team placed a tube in the right side of Robin's chest at 10:00 a.m. This tube revealed internal bleeding. The trauma team also took an x-ray of Robin's chest at 10:09 a.m. The trauma team received the x-ray results several minutes later. Those results showed that the right part of Robin's chest was fairly clear but suggested that there was blood in the left part of his chest. After receiving the results of the x-ray, the trauma team placed a chest tube in the left side of Robin's chest, which revealed substantial internal bleeding.

The trauma team transported Robin from the emergency department at 10:45 a.m., and Robin arrived in the operating room at 10:53 a.m. In surgery, the trauma team discovered that there was a tear in Robin's heart, another potential tear in his heart, and a small tear in the pericardium, the sac surrounding the heart. Robin bled to death while in surgery.

On November 20, 2003, Cleveland filed a proposed medical malpractice complaint with the Indiana Department of Insurance. In the proposed complaint,

3

Cleveland named Clarian, Methodist Hospital of Indiana, Inc., George Rodman, M.D., Scott Otto, M.D., and Jennifer Choi, M.D., as defendants.

On November 10, 2004, Cleveland deposed Dr. Choi. At her deposition, Dr. Choi testified about when the decision was made to take Robin to surgery and when an operating room became available once the decision to go to surgery had been made. According to Dr. Choi's deposition testimony:

CLEVELAND'S COUNSEL: Were you concerned when you placed that second chest tube and saw such a great amount of blood came out? Were you concerned that he was still bleeding?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: After you placed the second chest tube at 10:20, what was in the differential diagnosis at that time?

DR. CHOI: Major vascular injury and a cardiac injury.

CLEVELAND'S COUNSEL: Just those two things?

DR. CHOI: Essentially.

CLEVELAND'S COUNSEL: And the only way to find out if you have those or to repair those is to do surgery?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: So at 10:20 is it fair to say you knew that this patient needed to go to the operating room?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: Would you agree that when it was known that the patient had unstable vital signs since he arrived at 9:53; that it was known that he had a right chest tube that was positive for bleeding and a chest x-ray that showed a large left hemothorax; it was known that he had fallen 30 to 35 feet and had this flail chest that at that point in time, 10:09, you had information necessary that you knew that this patient needed to go to the operating room?

4

DR. CHOI: Although that chest x-ray was taken at 10:09, all of that information, particularly the left hemothorax and the left chest injury, were not known until 10:20 when the chest x-ray results were back and the chest tube was placed.

* * *

CLEVELAND'S COUNSEL:  What you're saying is that when you had the results from that chest x-ray at 10:09, whenever you had those results, that's when you knew he needed to go to surgery?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: Is 10:09 the time of exposure?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL:  Okay.  What was your treatment plan once you received the information from the reading of the 10:09 chest x-ray?

DR. CHOI: We planned to go to the operating room.

Table of Exhibits, Vol. 2, at 10 (emphases added).

But almost immediately after testifying that the trauma team had planned to take Robin to the operating room upon reading the 10:09 chest x-ray, Dr. Choi then stated as follows:

CLEVELAND'S COUNSEL: Did you think in your mind before they expressed the need for the patient to go to the operating room that this patient should go to the operating room?

DR. CHOI:  I don't remember.  The events happened very quickly, and on paper it looks like twenty minutes is a long time.  The way things are going in this kind of trauma situation, I can't tell you exactly when I decided that I thought the patient needed to go to the operating room.

5

Id. at 11 (emphasis added). And, on redirect examination by Clarian's counsel, Dr. Choi gave the following deposition testimony regarding when the decision was made to go to surgery:

> CLARIAN'S COUNSEL: Do you have a specific recollection as to the exact time a decision was made to take this patient to surgery?
>
> DR. CHOI: No.

Id. at 20.

> Regarding the availability of an operating room, Dr. Choi testified as follows:
>
> CLEVELAND'S COUNSEL: Why was there the time difference between 10:20 and 10:45?
>
> DR. CHOI: Once we realized we needed to go to the operating room for sure, we ma[d]e a phone call to the operating room and let them know the injury and the operating room needs. Given that he had a chest injury and a possible cardiac injury, we needed to be in a cardiac room. We were informed that a patient was leaving the room and they would have a room available soon but it would take a few minutes to set up.
>
> CLEVELAND'S COUNSEL: What time was that call made to the operating room to find out about the fact that there would be a little wait?
>
> DR. CHOI: That time is not recorded.
>
> * * *
>
> CLEVELAND'S COUNSEL: You mentioned that the call went to the operating room and that you were told that there was a patient leaving that room.
>
> DR. CHOI: As I remember, there was something to that effect, yes.
>
> * * *
>
> CLEVELAND'S COUNSEL: Okay. At 10:45 on page 12 where it says to OR, that's when the patient left the emergency department and started to the OR; is that correct?

6

DR. CHOI: Yes, sir.

CLEVELAND'S COUNSEL: Did the operating room call and say they're ready for you now? Is that what happened?

DR. CHOI: They did not.

CLEVELAND'S COUNSEL: How did that work?

DR. CHOI: We decided we'd waited on them long enough.

CLEVELAND'S COUNSEL: You never did receive a call from them?

DR. CHOI: I can't tell you for sure we didn't receive a call. What we did as we were wheeling him to the operating room, to the elevator, we called the charge nurse and said, "We're coming. What room shall we go to?"

\* \* \*

CLEVELAND'S COUNSEL: Let's look at the anesthesia record, which is on page 13. It says [the surgery] started at 11:00; correct?

DR. CHOI: It takes time to move the patient from the emergency room cart to the table. It takes time to position him the way he should be positioned to make a correct incision. As I recall, given our haste in bringing the patient, the room was not completely set up with all equipment out and available. It took a few minutes to open the operating room set.

CLEVELAND'S COUNSEL: That's what I was going to ask you. You had said that you had not received a call from the operating room but decided to go ahead anyway. My question is: Was their operating room available and ready for you when you arrived?

DR. CHOI: We went into the operating room, yes. I can't remember all the circumstances. We did not wait for any patient to leave that room, but as I recall, they were finishing mopping the floor, getting blood from the last case out, as we were rolling in.

CLEVELAND'S COUNSEL: So did you have to wait for them to finish their mopping?

DR. CHOI: We did not.

7

CLEVELAND'S COUNSEL:  Were they still mopping as you were bringing him in?

DR. CHOI:  Perhaps, but I don't remember.

Id. at 10-13 (emphases added).

On April 16, 2008, a Medical Review Panel convened and unanimously found that no medical malpractice had occurred.  Cleveland filed suit in the Marion Superior Court on July 15, 2008, naming the same defendants as in the proposed medical malpractice complaint.  Eventually, all of the defendants were dismissed except for Clarian.

Almost seven years after Dr. Choi's deposition testimony, in July of 2011, Cleveland and Clarian went to trial.  In her opening statement to the jury, Cleveland stated as follows:

> the trauma team decided that Rob needed to go to the operating room by 10:15, that is when they had the results from the 10:09 x-ray. . . .  Those x-ray results, along with all the other information they knew about Rob's condition, made it clear that the operating room was the only place that they could stop the bleeding.  They had the right plan, they did not execute it.  The team makes the right plan, we know that because Dr. Jennifer Choi is the only person who has a very clear recollection of when the decision was made.  Dr. Choi was running the trauma, rendering medical treatment to Rob, and very good at her job according to the chief resident.  Dr. Choi will tell you that the trauma team did decide that Rob needed to go to the operating room for surgery when they received the results from that 10:09 x-ray.  She does not know the precise time or minute that[] that happened, but she knows it's when they learned the 10:09 x-ray results.  Dr. Choi will tell you that the decision was a group decision, the decision of the trauma team. . . .  She said once we realized we needed to go to the operating room for sure we make a phone call, we've discussed the need to go to surgery then one of us goes and makes the call.  And there was no confusion about the timing of it.  I asked her very specifically, "what you're saying is that when you had the results from that chest x-ray at 10:09, whenever, you had those results that's when you knew you needed to go to surgery[.]" Answer: "Yes."  "Okay, what was your treatment plan once you received the information from the reading of the 10:09 chest [x]-ray.["  "]We planned to go to the operating room."  Despite that decision being made at

8

approximately 10:14, 10:15 Rob Cleveland was kept in the emergency department another 30 minutes until 10:45.

Transcript at 10-11 (emphases added). Cleveland also informed the jurors that they would hear the testimony of Dr. Rodman, "the only other person who has any recollection about this decision," and that Dr. Rodman would "support[] what Dr. Choi said." Id. at 11.

Cleveland's counsel then called Dr. Choi as her first witness. But almost as soon as Cleveland's counsel called Dr. Choi, he began to impeach her. Specifically, while Dr. Choi was discussing her professional background, Cleveland's counsel began asking her questions from her nearly seven-year-old deposition. See id. at 50-51. The impeachment of Dr. Choi continued into her testimony about the timing of the decision to take Robin to surgery:

> CLEVELAND'S COUNSEL: Okay. Doctor, when the trauma team had the results of the chest x-ray taken at 10:09 whenever you had those results that's when it was known that Mr. Cleveland needed to go to surgery, correct?
>
> DR. CHOI: I don't believe so.
>
> CLEVELAND'S COUNSEL: All right, [l]et's look at page 36 of your deposition, Doctor, line ten. Question: What you're saying is that when you had the results from that chest x-ray at 10:09 whenever you had those results that's when you knew he needed to go to surgery? Answer: Yes. That was your sworn testimony at that time was is [sic] not, Doctor, on November the 10th, 2004? Yes?
>
> DR. CHOI: Yes.
>
> * * *
>
> CLEVELAND'S COUNSEL: Isn't that true, Doctor, that[] that was your treatment plan once you received the information from the reading of the 10:09 x-ray that the trauma team planned to go to the operating room?

9

DR. CHOI: That was my answer in the deposition, yes.

CLEVELAND'S COUNSEL: All right, and you were giving the truthful answers, were you not?

DR. CHOI: According to my knowledge at that time, yes.

CLEVELAND'S COUNSEL: You were under oath at that time?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: And you had opportunity to review the chart and look things over?

DR. CHOI: I don't know that I reviewed the chart with great detail.

CLEVELAND'S COUNSEL: Are you saying to the Jury you would have come to the deposition on a [sic] important matter like that and would not have looked at the chart?

DR. CHOI: I would have looked at the chart, but I don't know that I would have known how specifically to look at the chart.

CLEVELAND'S COUNSEL: You don't know the exact time or the minute that[] that decision was made to go the [sic] operating room, do you?

DR. CHOI: I don't.

CLEVELAND'S COUNSEL: But, as we've talked about in your testimony, you do know that it was when you had the results of the 10:09 x-ray, don't you? That was your testimony wasn't it?

DR. CHOI: That was my testimony, yes.

Id. at 85-87.

Dr. Choi further testified at trial on the availability of an operating room as follows:

CLEVELAND'S COUNSEL: Right. Now, once the call was made the team was informed that a patient was leaving the room and they would

10

have a room available soon, but it would take a few minutes to set-up, isn't that true?

DR. CHOI: That was my testimony at the time, yes.

CLEVELAND'S COUNSEL: And that was true at the time, wasn't it?

DR. CHOI: Um.

CLEVELAND'S COUNSEL: You gave truthful testimony didn't you?

DR. CHOI: I gave truthful testimony to the best of my knowledge.

CLEVELAND'S COUNSEL: Isn't it also true, Doctor, that the operating room never called back to say they were ready for you?

DR. CHOI: I don't recall that.

CLEVELAND'S COUNSEL: Well, look at page 42 of your deposition line 22, are you there?

DR. CHOI: Yes.

CLEVELAND'S COUNSEL: Question: Did the operating room call and say they are ready for you now, is that what happened? Answer: They did not. Question: How did that work? Answer: We decided we'd waited on them long enough. Is that right, is that your answer?

Dr. CHOI: That was my testimony at the time.

* * *

CLEVELAND'S COUNSEL: When the trauma team got the patient upstairs the room was not ready, was it?

Dr. CHOI: When we got the patient upstairs, um, things were being done to prepare the room.

CLEVELAND'S COUNSEL: I'm sorry?

DR. CHOI: Things were being done to prepare the room.

CLEVELAND'S COUNSEL: All right. So, well it wasn't ready, correct?

11

DR. CHOI:  It's not uncommon for a room to not be completely –

CLEVELAND'S COUNSEL:  —well that's not—

DR. CHOI: —ready whenever a patient arrives in a room.

CLEVELAND'S COUNSEL:  I'm sorry to interrupt you, but that's not my question.  My question is when you got up there it wasn't ready, was it.

DR. CHOI:  It depends what you mean by ready.

CLEVELAND'S COUNSEL:  Okay, so let's look then on page 46 of your deposition starting at line 11.  As I recall given our haste in bringing the patient the room was not completely setup with all equipment out and available.  It took a few minutes to open the operating room set.  Is that your testimony?

DR. CHOI:  It is.

CLEVELAND'S COUNSEL:  In fact, they were finishing mopping up the floor from the previous, getting the blood out from the last case as you were rolling in, isn't that correct?

DR. CHOI:  Since my deposition I've had an opportunity to review the operative log and the operative records and that is not the case, my recollection at the time was incorrect.

CLEVELAND'S COUNSEL:  So you're changing your testimony?

DR. CHOI:  Yes, sir.

* * *

CLEVELAND'S COUNSEL:  Now, you said you got together and looked at the surgery schedule and that changed your mind, but looking at paper is not the same thing as wheeling a patient up and seeing blood in the operating room, is it?  I mean those are two different things aren't they?

DR. CHOI:  You know, there were a—it was a very eventful day, and I think my recollection was incorrect at the time of my deposition.

CLEVELAND'S COUNSEL:  Because now you've looked at papers to tell you that your memory about seeing blood being cleaned up in a operating room that you're trying to take a critical patient to that, initially dies in

12

front of your very eyes, now looking at paper that clears it up, you're saying five years later that clears it up, or seven years later?

\* \* \*

DR. CHOI: I think that the paper documentation definitely tells if somebody was in this room before we were.

Id. at 96-98, 141-142 (emphases added).

On July 21, 2011, the jury returned a verdict for Clarian. On August 22, 2011, Cleveland filed a motion to correct error and for relief from judgment. The trial court held a hearing on Cleveland's motion, after which it denied the motion. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

Cleveland appeals from the trial court's denial of her motion to correct error and for relief from judgment. We review the grant or denial of Trial Rule 59 motions to correct error and Trial Rule 60(B) motions for relief from judgment under an abuse of discretion standard. Speedway SuperAmerica, LLC v. Holmes, 885 N.E.2d 1265, 1270 (Ind. 2008); Outback Steakhouse of Florida v. Markley, 856 N.E.2d 65, 72 (Ind. 2006). On appeal, we will not find an abuse of discretion unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or is contrary to law. Miller v. Moore, 696 N.E.2d 888, 889 (Ind. Ct. App. 1998).

Here, Cleveland contends that Dr. Choi's change in testimony during trial was such a surprise that it materially prejudiced Cleveland's right to a fair trial. Cleveland further asserts that Clarian knew or should have known that Dr. Choi would change her

13

trial testimony from her deposition testimony and, as such, Clarian should have supplemented Dr. Choi's deposition testimony before trial pursuant to Indiana Trial Rule 26. Clarian's failure to supplement the changed testimony, Cleveland continues, constituted misconduct under Trial Rule 60, which, in turn, entitles Cleveland to a new trial. In addition to responding to each of those arguments, Clarian asserts on appeal that Cleveland waived these arguments by not making a timely objection or a motion for a mistrial during the trial. We will briefly address Clarian's waiver argument before turning to the merits of Cleveland's appeal.

## Issue One: Waiver

Clarian contends that Cleveland has not preserved its arguments for appeal. In Outback, our Supreme Court considered whether a fact witness's change in testimony between her deposition and the trial was a surprise that materially prejudiced the appellant's case. Although the appellant in Outback had not objected to the witness's testimony and did not move for a mistrial, our Supreme Court held that the appellant did not waive appellate review of the claim of surprise and proceeded to consider the merits of the appellant's arguments. 856 N.E.2d at 79. Specifically, the court stated that an argument of surprise, if properly founded, undermines the litigant's opportunity "to evaluate whether to seek a continuance, move for a mistrial, or redepose" the witness. Id. Following Outback, and considering the record in this case, we conclude that Cleveland has not waived her claims on appeal.

14

**Issue Two: Duty to Supplement Deposition**
**Testimony Under Trial Rule 26(E)(2)**

Cleveland contends that Clarian had a duty to supplement Dr. Choi's deposition

testimony under Trial Rule 26(E)(2). That Rule provides:

> <u>A party</u> who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
>
> * * *
>
> (2) <u>A party</u> is under a duty seasonably to amend a prior response if he obtains information upon the basis of which
>
> (a) he knows that the response was incorrect when made, or
>
> (b) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Ind. Trial Rule 26(E) (emphases added).

The question presented is whether, and, if so, under what circumstances, a party

has the duty to amend the prior deposition testimony of its nonparty employee.

Cleveland dismissed Dr. Choi as a party before trial and, therefore, she was not a party at

the time she purportedly changed her testimony at trial. Nonetheless, Clarian was always

a party, and Dr. Choi was always Clarian's employee. As such, Cleveland asserts that

Clarian is accountable and charged with responsibility to seasonably amend Dr. Choi's

deposition testimony.

Cleveland relies on our Supreme Court's opinion in <u>Outback</u>. But in <u>Outback</u>,

which is discussed in more detail in Issue Three, neither Trial Rule 26 nor a prior

deposition were involved. Rather, the court in <u>Outback</u> considered whether plaintiff's

15

attorney committed misconduct under Trial Rule 60 when he failed to amend the prior interrogatory response of his client, who was a party.

We need not decide whether, as Cleveland contends, Rule 26(E)(2) imposes a duty on a party to seasonably amend the prior deposition testimony of its nonparty employee. Assuming for the sake of argument that Rule 26(E)(2) does require an employer party to seasonably amend the prior deposition testimony of an employee, nonparty witness, for the reasons explained below in Issue Three, Cleveland has not demonstrated on this record that Clarian would have violated any such duty here and we conclude, therefore, that Clarian did not engage in the alleged misconduct.

### Issue Three:  Misconduct under Trial Rule 60(B)(3)

We now turn to the ultimate question in this appeal:  Cleveland's assertion that Clarian committed misconduct under Trial Rule 60(B)(3) by not supplementing Dr. Choi's deposition testimony under Trial Rule 26(E)(2).  Trial Rule 60(B) provides in relevant part:

> [T]he court may relieve a party . . . from a judgment . . . for the following reasons: . . .
>
>> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party . . .
>
> A movant filing a motion for reason[ ] . . . (3) . . . must allege a meritorious claim or defense.

To obtain relief under Trial Rule 60(B)(3), Cleveland must show each of the following: (1) Clarian's failure to supplement Dr. Choi's deposition testimony amounted to misconduct; (2) the misconduct prevented Cleveland from fully and fairly presenting her case at trial; and (3) Cleveland has made a prima facie showing of a meritorious claim.

16

Outback, 856 N.E.2d at 74. We hold that Cleveland cannot satisfy the first requirement. As such, we need not address whether Cleveland suffered prejudice or can make a prima facie showing of a meritorious claim.

Cleveland's misconduct argument is centered on our supreme court's decision in Outback, a dram shop case. In that case, witness Roysdon told the plaintiff's attorney that she had served one of Outback's customers while the customer was visibly intoxicated. The plaintiff's attorney never made Outback's counsel aware of this statement and failed to include Roysdon's name in an answer to an interrogatory that asked for the names of individuals with knowledge that Outback had served alcohol to a visibly intoxicated person. The plaintiff's attorney also failed to supplement this specific interrogatory later in the discovery process. Roysdon then later testified at her deposition, attended by Outback's counsel, that the customer had not been visibly intoxicated when she had served him.

On the Sunday before the trial continued, Roysdon met the plaintiff's attorney at his office. Roysdon told the plaintiff's attorney that she had lied during her deposition and that she planned to testify at trial that the customer had been visibly intoxicated when she served him. Plaintiff's attorney never disclosed to Outback's attorneys that Roysdon had recanted her testimony.

At trial, the plaintiff's attorney called Roysdon to testify. Outback's counsel did not object, although plaintiff's attorney had not listed Roysdon as a witness. Roysdon testified, in direct contradiction to her deposition testimony, that the customer had been visibly intoxicated when she served him. Outback's counsel impeached Roysdon with

17

her deposition testimony. Roysdon stuck with her trial version of the events, maintaining that the customer had been visibly intoxicated when served. Following the jury's verdict for the plaintiff, Outback's counsel conducted a post-trial deposition of Roysdon, in which they discovered that Roysdon had recanted her prior deposition testimony to plaintiff's attorney prior to trial.

The facts in Outback stand in significant contrast to the facts in this case. In Outback, there was both an initial omission when the plaintiffs failed to identify Roysdon as a person with knowledge of the relevant facts and a subsequent failure to supplement Roysdon's deposition when she outright recanted that testimony. The witness's deposition and trial testimony in Outback were unambiguous and polar opposites. Roysdon first testified that the customer was not visibly intoxicated and later testified that he was visibly intoxicated. That is not the case with Dr. Choi's testimony. Rather, while at times in her deposition testimony Dr. Choi claimed to have clear knowledge of the timeline of events, at other times she openly acknowledged that she could not clearly recall the timeline of events.

For example, when asked, "at 10:09 . . . that's when you knew he needed to go to surgery?", Dr. Choi responded, "Yes." Table of Exhibits, Vol. 2, at 10. But almost immediately after responding to that question, Dr. Choi stated, "I can't tell you exactly when I decided that I thought the patient needed to go to the operating room." Id. at 11. Later in the deposition, when asked if she had "a specific recollection as to the exact time a decision was made to take this patient to surgery?", Dr. Choi said "No." Id. at 20.

18

At trial, Dr. Choi ended up testifying that she could not recall the specific timeline of events. Specifically, when asked if she "kn[e]w the exact time or the minute that[] that decision was made to go the [sic] operating room," Dr. Choi stated, "I don't." Transcript at 87. Her trial testimony on the timeline of events does not directly contradict her deposition testimony any more than her own deposition testimony was already internally inconsistent.

Neither does Dr. Choi's testimony regarding the availability of an operating room in itself demonstrate that Clarian committed misconduct by not amending the deposition testimony before trial. At her deposition, Dr. Choi explained that she was testifying from memory and that she had not reviewed the operating room schedule or logs. Her deposition testimony on this question was, like her testimony regarding the timeline of events, inconsistent. For example, Dr. Choi stated that she "remember[ed]" being told that an operating room was available when she first called at 10:20, Table of Exhibits, Vol. 2, at 11, but then almost immediately acknowledged that she could not recall when she was told the operating room was available, id. at 12.

Before trial, nearly seven years after her deposition and almost a decade after the events in question, Dr. Choi reviewed the operating room schedule and logs and concluded that any delay could not have been due to a lack of an available operating room. See Transcript at 96-98, 141-142. Again, given the ambiguous nature of her original deposition testimony, we cannot say that her subsequent trial testimony was directly contradictory, as in Outback. And there is nothing unusual about a witness using

19

a contemporaneous record to refresh her recollection, especially when the events in question occurred almost a decade before her trial testimony.

Further, in Outback the witness who recanted her testimony was unquestionably the critical material witness. Here, Dr. Choi was one of several witnesses involved in the underlying incident. Specifically, she was a second-year resident at the time of the events and a junior member of the trauma team. Dr. Rodman headed the trauma team and was the one responsible for evaluating the medical evidence and making the decisions. And Dr. Rodman testified that the earliest a decision to take Robin to the operating room could have been made was 10:45. Transcript at 500.

When Dr. Choi's deposition testimony is considered in its entirety, there is an insufficient factual basis in the record to conclude that there was a clear, substantial, and material change in her testimony that, if Trial Rule 26(E)(2) applied, would have triggered any duty on Clarian's attorneys to amend that testimony prior to trial. As the trial court stated during its hearing on Cleveland's motion to correct error and for relief from judgment:

> I'll suggest this[:]  I heard the witness testify[.]  I thought she was a goof[.]
> I thought[,] my God[,] this woman is a doctor . . . .  [S]he[] shouldn't be a
> doctor at a trauma center for crying out loud . . . .  [T]hat was my
> impression[.]

Id. at 598.

Outback is distinguishable for another significant reason. In Outback the relevant witness informed Outback's counsel during her post-trial deposition of her meetings with the plaintiff's attorney. There is no such evidence in this case. At oral argument Cleveland asserted that Clarian "woodshedded" Dr. Choi and, in effect, that Clarian had

coached its employee to change her deposition testimony at trial. This is one plausible explanation for the variance between Dr. Choi's deposition and trial testimony. But Cleveland did not conduct post-trial discovery, and she does not specify where in the record it is demonstrated that Clarian recognized that Dr. Choi had changed or would change her testimony. Indeed, given the fact that Dr. Choi's deposition testimony was inconsistent, we are not convinced that Clarian knew what her trial testimony would be.

In any event, Cleveland embarked on a trial strategy that sought to make Dr. Choi her featured witness and the linchpin of her case. Thus, Cleveland contends that, just as in Outback, the trial would have unfolded differently if Clarian's attorneys had discharged their discovery obligations. See Outback, 856 N.E.2d at 76. In her opening argument, Cleveland told the jury that Dr. Choi was the only witness who had a "very clear recollection" of the events in the emergency room and that there was "no confusion about the time" of the decision to take Robin to the operating room. See Transcript at 10-11. But that claim mischaracterized Dr. Choi's inconsistent deposition testimony. Further, Dr. Choi was not Clarian's witness, and she did not appear on Clarian's final witness list. The reason for this was plainly stated by the trial court during its hearing on Cleveland's motion to correct error and for relief from judgment:

> [Clarian] may or may not have called her as a witness[. M]y guess is [Clarian] was never going to call her as a witness[] because she was such a crappy witness . . . and an unaccountable witness . . . and someone [Clarian] couldn't control . . . and [she] came across as a dingbat in front of this jury.

Id. at 604-05.

21

Internal inconsistencies aside, Dr. Choi's deposition testimony was nearly seven years old, and Cleveland did not seek a second, updated deposition[2] or propound interrogatories or requests for admissions. Neither did she request to voir dire Dr. Choi outside the presence of the jury, otherwise attempt to explore the circumstances of the purported change in testimony, or move for a mistrial. And Cleveland moved so quickly to impeach Dr. Choi with her deposition testimony—first interrupting her while she was describing her professional background—that it appears that Cleveland was aware of the potential inconsistencies in Dr. Choi's deposition testimony and that Cleveland would need to emphasize only those parts of her testimony that would bolster Cleveland's case. As the trial court noted: "[Cleveland's counsel] had everything marked in his deposition[. I]t was almost as if he knew she was going to change her testimony[] because it took some doing to have that deposition index[ed] the way his was." Id. at 600.

Even if Cleveland could demonstrate that Dr. Choi's trial testimony suggests misconduct by Clarian, on these facts our abuse of discretion standard of review requires that we affirm the trial court's denial of Cleveland's motion to correct error and for relief from judgment. Cleveland has presented no clear evidence, as was done in Outback, that would permit the trial court or this court to impute a charge of misconduct to Clarian. Considering the absence of a factual basis demonstrating that Clarian knew or should have known that Dr. Choi's trial testimony would render her prior responses incorrect,

---

[2] In her brief, Cleveland states that she attempted to speak to Dr. Choi twice "[j]ust prior to trial" but that Clarian refused on the basis that Dr. Choi was Clarian's employee. Appellant's Br. at 14. Although Clarian declined to make Dr. Choi available voluntarily, Cleveland could still have propounded interrogatories, submitted requests for admissions, or subpoenaed Dr. Choi for another deposition.

we cannot say that Clarian either had a duty to supplement Dr. Choi's deposition testimony or committed misconduct by failing to amend that testimony. <u>See</u> T.R. 60(B); T.R. 26(E)(2); <u>Outback</u>, 856 N.E.2d at 74.

**Conclusion**

In sum, we hold that Cleveland may argue surprise in a witness's purported change in testimony for the first time on appeal. But, on these facts, we hold that the trial court did not abuse its discretion when it denied Cleveland's motion to correct error and for relief from judgment. We cannot say on this record that Dr. Choi's trial testimony was so different from her deposition testimony that it invoked, as alleged, any duty on the part of Clarian to amend under Trial Rule 26(E)(2) or that Clarian committed misconduct under Trial Rule 60(B)(3). Thus, we affirm the trial court's denial of Cleveland's motion to correct error and for relief from judgment.

Affirmed.

RILEY, J., and KIRSCH, J., concur.